UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF MISSISSIPPI

IN RE: GLEN COTHERN and CHARLOTTE COTHERN     CASE NO. 10-10205-DWH
CHAPTER 13

## OPINION

On consideration before the court is the objection filed by the debtors, Glen Cothern and Charlotte Cothern, to the secured claim of American Home Mortgage Servicing, Inc.; as well as, the objection to confirmation of the debtors' Chapter 13 plan filed by American Home Mortgage Servicing, Inc.; responsive pleadings having been filed to each of the aforesaid objections; on proof in open court; and the court, having heard and considered same, hereby finds as follows, to-wit:

I.

The court has jurisdiction of the subject matter of and the parties to these proceedings pursuant to 28 U.S.C. §1334 and 28 U.S.C. §157. These are core contested proceedings as defined in 28 U.S.C. §157(b)(2)(A), (B), (L), and (O).

II.

## PROLOGUE

"The incompetence here is absolutely radiant."

"In short, a man comes into this hospital in perfect health, and, in the space of one week, we chop out one kidney, damage another, reduce him to coma, and damn near kill him."

The above quotes come from the screenplay for the movie, *The Hospital*, a "black comedy" written by Paddy Chayefsky and directed by Arthur Hiller. The speaker was Dr.

Herbert Bock, played by actor George C. Scott, who was expressing his complete frustration with the quality of medical care being dispensed by the medical facility where he was Chief of Medicine. These comments are fitting for the factual events that underpin these two contested bankruptcy proceedings.

### III.

### CHRONOLOGY OF FACTUAL EVENTS

Glen Cothern and his wife, Charlotte, (collectively the "Cotherns"), own their home which is located at 7325 Highway 309 South, Holly Springs, Mississippi. This home has been continuously insured by Allstate Insurance Company through a standard homeowners policy since October 8, 2005. The policy has a limit of $141,033.00, and includes the designation of American Home Mortgaging Servicing, Inc., ("AHMSI"), as the first mortgagee/loss payee. See AHMSI Exhibit 1.

In order to refinance their home loan, the Cotherns entered into a transaction on January, 19, 2007, with Terrace Mortgage Company. They executed a promissory note in the principal sum of $128,800.00, bearing interest at the rate of 6.875% per annum, and payable in monthly installments of $846.12, beginning on March 1, 2007. The promissory note was secured by a deed of trust, dated January 19, 2007, which encumbered their residence. The trustee in this instrument was Luckie H Land Title, Inc., and the beneficiary was designated as Mortgage Electronic Registration Systems, Inc., ("MERS"), as the nominee for the lender and the lender's successors and assigns. See Cothern Exhibits 1 and 2.

Because the Cotherns agreed to pay directly the annual real estate tax assessments, and because they agreed to provide their own homeowners' insurance coverage, Terrace Mortgage

2

Company waived the requirement that an escrow account be established in connection with the loan transaction for the purpose of collecting funds with which to satisfy these obligations. An unsigned copy of the escrow waiver agreement was received in evidence as Cothern Exhibit 3.

From the evidence presented, Cothern timely paid his insurance premiums (Cothern Exhibit 4), paid his real estate tax assessment each year (Cothern Exhibit 5), and timely paid each monthly installment required by the promissory note from March 1, 2007, through June 3, 2009 (Cothern Exhibit 6). The last two payments were refused by AHMSI.

On October 12, 2007, AHMSI sent a letter to Cothern advising him as follows: "To date, American Home Mortgage has not received a hazard insurance renewal certificate or a replacement policy for the above address. Our records indicate that your policy expired on 10/08/2007." The language that the policy "expired on 10/08/2007" is absolutely false. The letter further stated that if AHMSI did not receive evidence of continuous coverage, it would force place hazard insurance. See AHMSI Exhibit 3.

Cothern acknowledged that he received this notice and testified that he had a telephone conversation with an AHMSI representative, advising this person that his insurance had not expired. He also had his insurance agent fax a copy of the insurance policy to AHMSI evidencing that it was still in force. Contrary to the comment in AHMSI's letter, Cothern testified that the insurance coverage never expired. As conclusively established by the various exhibits that were introduced into evidence, Cothern was absolutely correct.

On November 16, 2007, AHMSI sent a second letter to Cothern again reflecting a hazard insurance expiration date of October 8, 2007. The letter indicated that AHMSI had not received proof of a valid insurance policy, and, as a result, had secured temporary insurance coverage

through a sixty (60) day binder. The letter informed that, upon prompt receipt of Cothern's policy, the binder would be cancelled and, if there was no lapse in coverage, there would be no charge. See AHMSI Exhibit 4. During his cross-examination, Cothern reiterated that he sent copies of his insurance policy to AHMSI on several occasions. In the opinion of the court, Cothern was a very candid and credible witness.

Despite the fact that the insurance coverage was actually in place, on January 4, 2008, AHMSI sent another letter to Cothern indicating that it had not received proof of insurance. AHMSI advised Cothern that it had obtained force placed insurance and enclosed a copy of the policy with the letter which required a premium of $2,002.00. See AHMSI Exhibit 5. In its monthly billing statement, dated January 10, 2008, AHMSI indicated that it had established an escrow account for the Cotherns' loan, and the escrow balance was a negative $2,002.00, which represented the unpaid force placed insurance premium. See Cothern Exhibit 7.

Because the escrow account had a significant negative balance, AHMSI, in keeping with its customary accounting practices, did not apply Cothern's regular monthly installment payments to the actual principal and interest owed on the indebtedness. Even though the monthly payments were timely made, because of the payment application methodology, an arrearage began to build in the amounts of principal and interest owed. According to the testimony of Lorraine Baggs, Bankruptcy Supervisor, AHMSI, the monthly payments would be placed in suspense because the amount was insufficient to pay the full amount due. This additionally resulted in late payments being assessed because the full payment was not technically received before the 15th day of each month. Introduced during Baggs' testimony was AHMSI Exhibit 9 which reflects that the Cotherns were assessed late charges from July, 2008, through January,

2010, in the total sum of $744.48. The payment application methodology had a "lose - lose" effect on the Cotherns. Although the regular payments were being made timely, the allocation of the payments to the suspense category never permitted the Cotherns to "catch up." Since no payment would satisfy the full amount that AHMSI considered that it was owed, the payment was treated as if it were late and a late charge was assessed each succeeding month. This culminated in AHMSI's refusal to accept the Cotherns' monthly payments beginning in May, 2009.

Baggs indicated that AHMSI received its first actual notice that the Cotherns' insurance was in effect in August, 2008. Clearly, this is when the Cotherns' nightmare should have ended. Shortly thereafter, on October 15, 2008, Allstate sent the fax notification (AHMSI's Exhibit 1) corroborating that the Cotherns had continuous coverage since October 8, 2005. Although Baggs acknowledged that Cothern had contacted an AHMSI representative telephonically in late 2007 advising that he did indeed have insurance coverage, she added that AHMSI never received any additional notice other than his call. Ordinarily, when an insurance policy expires or lapses, the insurance carrier will expressly notify the loss payee. A notice of this nature was never sent to AHMSI because the "triggering" event never happened.

After receiving notice that the insurance coverage had not expired, AHMSI "refunded" the $2,002.00 force placed premium to the Cotherns. In "refunding" this premium, which was never actually owed, AHMSI through accounting entries simply created a surplus balance in the escrow account that AHMSI recently established. This is evidenced by the September, 2008 "actual deposit" entry on Cothern Exhibit 9. Although there was no testimony explaining this

specific entry, it appears to be comprised of the $2,002.00 premium amount plus $408.97 from the Cotherns' regular monthly payments for a total deposit into the escrow account of $2,410.97.

Despite the fact that AHMSI now knew that the Cotherns had insurance coverage, it still persisted, contrary to the escrow waiver agreement, in maintaining the escrow account. AHMSI Exhibit 7, a letter to Cothern dated December 11, 2008, reads as follows:

> Please be advised, the annual hazard insurance amount was adjusted to $980.05. The following is a breakdown of the new monthly mortgage payment:
>
> | | |
> |---|---|
> | Principal and interest: | $846.12 |
> | Hazard insurance: | 81.67 |
> | Total | $927.79 |

The adjustment of the hazard insurance annual premium to $980.05, downward from $2,002.00, equaled the amount of the annual premium payment that the Cotherns owed to Allstate for the October 1, 2008 - September 30, 2009 period. Cothern was obviously paying the insurance premiums directly to his insurance agent during this same period. AHMSI must have recognized this because it initially made a disbursement entry from the escrow account of $980.05 in September, 2008, but nullified that with an identical deposit entry of $980.05 in October, 2008. See Cothern Exhibit 9.

AHMSI's practice of maintaining the escrow account and increasing the Cotherns' monthly payments continued throughout 2009 and into 2010. The Annual Escrow Analysis Statements, introduced into evidence as Cothern Exhibits 9 and 12, substantiate AHMSI's complete disregard for the fact that Cothern was consistently paying his insurance premiums directly. An examination of the escrow statements indicates that Cothern personally paid the premiums and kept the Allstate insurance in effect at least until October, 2009. On October 10,

2009, AHMSI made a disbursement from the Cotherns' escrow account in the sum of $855.00, in order to pay the premium for the period of October 1, 2009 to September 30, 2010. This occurred after AHMSI had begun to refuse the Cotherns' regular monthly payments for reasons that are at best inexplicable. Cothern contacted his insurance agent to continue his coverage and learned that AHMSI had just made the aforementioned payment. That was the first time that Cothern actually stopped paying the premiums. Not long thereafter, he sought the advice of an attorney.

On May 19, 2009, the law firm representing AHMSI, Adams & Edens, sent a letter to the Cotherns advising that the law firm had been retained to foreclose on their residential property. See Cothern Exhibit 10. In attempting to resolve this dilemma, Cothern corresponded with the law firm and received a reply to his correspondence on July 23, 2009. See Cothern Exhibit 11. In the opinion of the court, this is typical of Cothern's conduct and demonstrates that he is not one to ignore correspondence or notices. Cothern obviously advised the law firm that he had continuous insurance coverage in effect because this was verified by one of the firm's attorneys who actually contacted Cothern's insurance agent.

AHMSI was not deterred by Cothern's explanation, or its own lawyer's investigation, and continued the foreclosure process. This is evidenced by the Adams & Edens foreclosure billing to AHMSI in the sum of $940.00. Incredibly, the foreclosure was pursued during the same time frame that Cothern was actually keeping his insurance in effect. AHMSI had to know that the insurance premiums were being paid by Cothern because it redeposited the $980.05 premium amount into the Cotherns' escrow account as discussed hereinabove. This amount was identical to the premium that Cothern was paying for the 2008 - 2009 policy year. AHMSI

7

unilaterally derailed this entire transaction by creating and then obstinately maintaining the escrow account which was simply unnecessary. The foreclosure, however, was stopped when the Cotherns filed their voluntary Chapter 13 bankruptcy petition on January 15, 2010.

Further evidencing AHMSI's complete disregard for the fact that the Cotherns always had viable insurance in force is the objection to confirmation of the Cotherns' Chapter 13 plan filed by AHMSI. On Exhibit A, appended to the objection, AHMSI calculated the detail of the Cotherns' purported arrearage as follows:

| | |
|---|---:|
| 12 payments February 2009 through January 2010 @ $927.79 each: | $11,133.48 |
| 2 payments February 2010 through March 2010 @ $927.79 each: | 1,855.58 |
| Accrued late charges | 744.48 |
| **ATTORNEY FEES AND COSTS | 940.00 |
|    foreclosure attorney fees $550.00 | |
|    title costs $390.00 | |
| **OTHER CHARGES | |
|    Inspection Fees | 115.60 |
|    Appraisal Fees | 280.00 |
|    Less Suspense Account Balance | ( 63.91) |
| TOTAL ARREARAGE | $15,005.23 |

Exhibit A demonstrates that AHMSI was not applying the Cotherns' payments to principal and interest. Cothern paid what he thought was his regular monthly payment through April, 2009. As mentioned hereinabove, his May and June 2009 payments were refused. Yet, AHMSI asserts that Cothern owes for installments beginning in February, 2009. The court concludes that AHMSI calculated its claim in this manner because it had diverted the Cotherns' payments to suspense and to escrow long after it had knowledge that the insurance coverage was a non-issue. There is no reasonable justification for servicing the Cotherns' loan in this way.

There is no doubt that the unrelenting actions of AHMSI drove the Cotherns into bankruptcy. They were not delinquent on any other debts, and they filed bankruptcy as an "eleventh hour" mechanism to prevent the loss of their home. AHMSI's conduct throughout this factual scenario represents the most callous and egregious effort to collect an indebtedness that was never owed that this court has been called upon to review. Succinctly stated, AHMSI's incompetent servicing tactics converted a loan transaction that was being paid like "clockwork" to a loan that was virtually impossible to pay, particularly for modest income borrowers.

IV.

AHMSI's STANDING

The Cotherns have recently raised the issue that AHMSI lacks standing to object to the confirmation of their Chapter 13 plan despite the fact that they scheduled AHMSI as a secured creditor in the plan. AHMSI's standing in this proceeding would necessarily have to be derived through its capacity as the authorized mortgage servicer for Federal National Mortgage Association ("FNMA" or "Fannie Mae"), which both parties agree is the current beneficial owner of the Cotherns' mortgage loan. See Cothern Exhibit 14. The chain of title to FNMA goes through American Home Mortgage Corporation, which conveyed the subject loan to FNMA pursuant to a Master Agreement. As discussed hereinbelow, Terrace Mortgage Company endorsed the Cotherns' promissory note to American Home Mortgage Corporation.

The servicing rights to the Cotherns' loan takes a much more tortured path. AH Mortgage Acquisition Co., Inc., which is now known as American Home Mortgage Servicing, Inc., or AHMSI, acquired the servicing rights pursuant to an Asset Purchase Agreement approved by the United States Bankruptcy Court for the District of Delaware on September 25, 2007. The

bankruptcy case involved a conglomeration of several Chapter 11 debtors in a case styled *American Home Mortgage Holdings, Inc., a Delaware Corporation, et al.*, Case No. 07-11047. One of the named debtors was American Home Mortgage Corporation. The order approving the transaction was appended as Exhibit A to the memorandum submitted by AHMSI in this proceeding.

To further substantiate its ability to appear as a party in this bankruptcy case, AHMSI presented the original promissory note executed by Cothern which had been endorsed to American Home Mortgage Corporation by Craig A. James, President, Terrace Mortgage Company.

While this issue is not extremely significant in view of the other matters that have occurred in this proceeding, the court is of the opinion that AHMSI has sufficient standing to prosecute its objection to confirmation of the Cotherns' Chapter 13 plan.

V.

## RELIEF REQUESTED AND ALLOWED

In their objection to the claim filed by AHMSI, the Cotherns requested the following relief:

A. That the Court order creditor to provide a complete breakdown of the charges listed in the proof of claim;

B. That the Court order creditor to provide a complete life of loan transactional history for the mortgage loan in question;

C. That should creditor not provide proof of the charges listed in the proof of claim the Court enter an order disallowing the charges;

D. That the Court order creditor to provide a complete escrow breakdown including all amounts creditor alleges will be paid through the escrow account;

 E. That should creditor not provide proof of the amount alleged as escrow the Court order the proper ongoing mortgage payment be $846.12; and

 F. That the debtors have such other and further relief as the Court may deem just and proper under the circumstances.

In their brief in support of their objection to the AHMSI proof of claim, which is not considered a pleading, the Cotherns expanded their requests for relief, as follows:

 A That the Court deny AHMSI's Objection to Confirmation;

 B. That the proof of claim filed by AHMSI be disallowed;

 C. That the Court issue a Show Cause Order to determine why AHMSI should not be sanctioned;

 D. That the debtors have and recover against AHMSI a sum to be determined by the Court in the form of actual and punitive damages;

 E. That the attorney for the debtors be awarded reasonable legal fees; and

 F. That the debtors have such other and further relief as the Court may deem just and proper.

The court is of the opinion that it is appropriate to award relief that is requested in a pleading, i.e, a motion or a complaint, not in a brief or memorandum. Therefore, the court will only address those items of relief that were requested in the Cotherns' objection to the AHMSI proof of claim. If the Cotherns choose to pursue additional relief, they must do so by filing an appropriate pleading. The decision that this court renders as a result of this opinion and the related order that will be entered contemporaneously herewith will be without prejudice to the Cotherns seeking additional relief.

Considering the relief that has been requested herein, coupled with the factual events that underpin these contested proceedings, specifically the inappropriate manner in which AHMSI

11

serviced the Cotherns' loan, the court concludes that AHMSI must recalculate the Cotherns' loan in the following respects:

    A.    AHMSI must give the Cotherns credit for all payments made through April, 2009, at the rate of $846.12 per month.

    B.    The loan will be deemed current as of April 30, 2009.

    C.    The monthly installment payments that have accrued from May, 2009, through September 30, 2010, must be added to the end of the regular loan term and shall thereafter be paid by the Cotherns at the rate of $846.12 per month. In effect, this will extend the term of the Cotherns' loan by 17 months.

    D.    All interest accrued on the loan will be disallowed for the 17 month period between May 1, 2009, and September 30, 2010. The accrual of interest at the contract rate shall recommence on October 1, 2010.

    E.    The Cotherns must resume their regular monthly payments at the rate of $846.12 per month beginning in October 2010, with the first payment being made on or before October 15, 2010, and these payments shall continue monthly thereafter until the loan is fully paid.

Since the sum of $855.00, representing the insurance premium paid by AMHSI for the policy year October 1, 2009, through September 30, 2010, was actually withdrawn from the Cotherns' escrow account, it will be considered as if the Cotherns personally paid their annual premium for the 2009 - 2010 policy year in keeping with the requirements of the deed of trust encumbering their property.

The escrow account shall be immediately dissolved and the funds remaining therein shall be disbursed to the Cotherns. It shall not be reinstated unless the Cotherns default on their payments as ordered by the court herein.

The Cotherns shall resume the responsibility for paying their insurance premiums directly beginning in October, 2010. Likewise, they shall timely pay their real property tax assessments annually.

All other charges and assessments included by AHMSI on its proof of claim, including, but not limited to, accrued late charges, attorney fees and costs, title costs, inspection fees, and appraisal fees, are hereby disallowed as being unreasonable and unnecessary.

Because the court concludes that the conduct of AHMSI was so egregious in servicing the Cotherns' loan, the court will award the Cotherns their attorney fees and costs related to these two contested proceedings as a monetary sanction. (The court notes at this point that there was no proof offered concerning actual damages sustained by the Cotherns at either of the two hearings conducted to consider these proceedings other than the obvious mental anxiety, stress, and frustration that was experienced by Mr. Cothern in his Kafkaesque relationship with AHMSI.) The attorneys representing the Cotherns may submit an itemized statement of their fees and costs incurred during this representation within 30 days from the date of this opinion. The attorneys representing AHMSI will have 30 days thereafter to file any response or objection to the reasonableness of the fees and costs requested. The court will thereafter render a decision setting an appropriate award.

AHMSI's objection to the confirmation of the Cotherns' Chapter 13 plan will be overruled. Likewise, the Cotherns' objection to AHMSI's proof of claim will be sustained in keeping with the provisions set forth in this opinion.

A separate order, consistent with this opinion, will be entered contemporaneously herewith.

This the 26th day of August, 2010.

/s/ David W. Houston, III
DAVID W. HOUSTON, III
UNITED STATES BANKRUPTCY JUDGE